IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OLABISI ARIGBON                                              CV. 09-311-PK

                                                            OPINION AND ORDER

                           Plaintiff,

v.

MULTNOMAH COUNTY

                           Defendant.
_____

PAPAK, Magistrate Judge:

      Plaintiff Olabisi Arigbon asserts eight claims for relief against her former employer,

defendant Multnomah County, including pregnancy and race discrimination and retaliation in

violation of Title VII; race and gender discrimination and retaliation in violation of Or. Rev. Stat.

§ 659A.030(1); interference and retaliation in violation of Or. Rev. Stat. § 659A.183 and

wrongful discharge under common law.  Arigbon now concedes her wrongful discharge claim

and I accordingly dismiss that claim with prejudice.

      The parties' cross motions for summary judgment on the remaining claims are now before

OPINION AND ORDER – PAGE 1

the court, as are several motions to strike evidence submitted in conjunction with those motions. This court has jurisdiction under 28 U.S.C. §§ 1331, 1343 and 1367. For the reasons set forth below, I deny as moot Arigbon's Motion to Strike Defendant's Exhibit 132 (#99), Arigbon's Motion to Strike Defendant's Exhibit 202 and 203 (#102) and Arigbon's alternative motion to strike contained in her Motion for Leave to File a Sur-Reply (#113). In addition, the County's Motion to Strike Hearsay (#89) is denied in part and denied as moot in part. Finally, Arigbon's Motion for Summary Judgment (#65) is denied and the County's Motion for Summary Judgment (#69) is granted in part and denied in part, as set forth below.

## BACKGROUND

Defendant Multnomah County hired plaintiff Olabisi Arigbon in April 2007 to serve as a Case Manager 1 in the Aging and Disability Services division. Jennifer Foreman, a Caucasian woman, had started work in the same position two weeks earlier. (Oldham Decl. Ex. 1 at 3.) Arigbon is African-American. Before she joined Multnomah County, Arigbon worked for eighteen months as a case worker for the State of Oregon. (Oldham Decl. Ex. 1 at 2, Carter Decl. Ex. 110, 197 at 3.)

Arigbon and Foreman were probationary employees for the first year of their employment and Martha Murray served as their direct supervisor. (Carter Decl. Ex. 197 at 3.) The County requires that probationary employees receive quarterly evaluations during the year that they are on probationary status, although supervisors often fail to complete the evaluations on time. (Oldham Decl. Ex. 3 at 4, Ex. 5 at 5; Carter Dec. Ex. 194 at 2.) The evaluations aim to assess where the employee stands in the training process and identify areas for improvement. (Oldham Decl. Ex. 3 at 4; Carter Decl. Ex. 151.) The County, however, may remove a probationary employee at any time during the probationary period. (Oldham Decl. Ex. 5 at 5.)

OPINION AND ORDER – PAGE 2

The County has a labor agreement with the Multnomah County Employees Union. Under the terms of that agreement, the County can dismiss a probationary employee without providing the employee recourse to a grievance procedure. (Oldham Decl. Ex. 39 at 4.) Article 26 of the agreement provides that the union and the County may amend the agreement. *Id.* at 13. The agreement, however, provides that, "[t]he length of an employee's probationary period may not be extended . . . under the terms of Article 26, unless the employee was absent for a period of six (6) months prior to the extension." *Id.* at 4. Under the portion of the agreement governing workers' compensation, the agreement provides, "[I]f an employee sustains an injury during his probationary period, it may be extended by written agreement of the Union, the employee and the County." *Id.* at 12.[1]

## I.    Arigbon's Employment Conditions Before She Announced Her Pregnancy

Case managers in the Aging and Disability Services division determine eligibility and administer benefits for government assistance programs, such as Medicaid and food stamps. (Carter Decl. Ex. 127.) The job requires accuracy, attention to detail and the ability to follow up with others to obtain required information and ensure compliance with federal and state regulations. (Carter Decl. Ex. 111.) The average caseload for each manager is between 450 to 500 clients. (Carter Decl. Ex. 152 at 3.)

### A.    Arigbon's Caseload

Murray assigned a caseload to Arigbon and Foreman when they started working for the

---

[1] The worker's compensation provision reads in full: "In accordance with the terms of Article 2, 'Section VIII,' if an employee sustains an injury during his probationary period, it may be extended by written agreement of the Union, the employee and the County." Article 2, Section VIII, however, relates to on-call employees, who serve on an intermittent or part-time basis with no provision for becoming permanent employees. *Id.* at 3. Thus, it appears that the agreement's reference to Section VIII is a typographical error.

County.  (Oldham Decl., Ex. 1 at 3, 11.)  Although Arigbon and Foreman each had between 450

and 520 cases, Arigbon's caseload was not up to date and was disorganized, whereas Foreman's

cases were up to date.  (Oldham Decl. Ex. 1 at 3, 10-11, Carter Decl. Ex. 128, Ex. 195 at 3-4.)  In

addition, shortly after Arigbon started working for the County, Murray assigned Arigbon as the

back-up person for a coworker with a challenging caseload and for a portion of another

coworker's caseload, whereas Foreman only had to fill in for a portion of one coworker's

caseload.  (Oldham Decl. Ex. 1 at 6-8; Ex. 7 at 8, Ex. 14 at 2; Carter Decl. Ex. 179.)  Arigbon

also received transfer files more frequently than Foreman.  (Oldham Decl. Ex. 1 at 4, 17; Ex. 8 at

1; Ex. 9 at 1.)  Arigbon asked Murray for help with her caseload in October and November 2007.

(Oldham Decl. Ex. 1 at 4-6.)

     **B.**    **Training Opportunities**

    Arigbon testified that, in July, October and November 2007, she asked Murray for help or

training because she did not know all of the County's eligibility programs and computer systems,

nor did she know how to sign up for classes.  (Oldham Decl. Ex. 1 at 4-5, 13, 15, 32.)  Although

Arigbon already knew how to administer food stamps from her prior experience with the State of

Oregon, her position with the County served a different client population and used different

computer programs.  (Oldham Decl. Ex. 1 at 11, Ex. 17; Carter Decl. Ex. 178.)  Arigbon did not

request a specific class or training program because she did not know what was available.

(Oldham Decl. Ex. 1 at 4, 12-13.)  Murray knew that case managers required training to learn

how to do the job and that Arigbon did not know all of the relevant computer programs, but she

did not tell Arigbon which classes to take or how to sign up for training.  (Oldham Decl. Ex. 1 at

4, 6, Ex. 17, Ex. 23 at 4, ex. 43 at 7-8.)

    The evidence also shows, however, that the County helped Arigbon with some training

matters.  Shortly after Arigbon started work, the County registered her for several classes. (Oldham Decl. Ex. 18, 19, 22; Carter Decl. Ex. 119, 169, 170, 173.)  In addition, Murray later offered to help Arigbon when she had not finished an online training.  (Carter Decl., Ex. 136, 167.)  Moreover, Murray included Arigbon on emails to the staff about training opportunities that arose and let her know to register for them online.  (Carter Decl. Ex. 171, 172.)  Evidence also shows that Arigbon knew how to access online registration.  (Carter Decl. Ex. 175 at 2.)  Finally, Murray provided feedback to Arigbon as issues or mistakes came up in her work.  (Carter Decl. Ex. 157, 158, 159, 161, 162-166.)

Apart from her new employee orientation, Arigbon completed only three training classes. (Oldham Decl. Ex. 1 at 31; Carter Decl. Ex. 119.)  She failed to attend one class due to a death in the family and missed another class because she did not see it on her list of online registrations. (Oldham Decl. Ex. 13 at 4; Carter Decl. Ex. 174, 175.)  Murray, however, told human resources, that Arigbon had received all the training that she needed.  (Oldham Decl. Ex. 5 at 7.)

Foreman took eleven training classes. (Oldham Decl. Ex. 1 at 31, Ex. 14; Carter Decl. Ex. 120.)  Before Foreman joined the County, she helped clients fill out paperwork but did not issue benefits under government assistance programs or use State of Oregon computer programs. (Oldham Decl. Ex. 7 at 2; Carter Decl. Ex. 197 at 4.)  Murray and other County employees helped Foreman identify the training she needed and told her how to sign up for training. (Oldham Decl. Ex. 7 at 3, 6, Ex. 23 at 21.)  Arigbon testified that the classes Foreman took would have been helpful but those classes were not offered to her.  (Oldham Decl. Ex. 1 at 31-33.)

### C.    Arigbon's First Employment Evaluation

Murray completed her first evaluation of Arigbon's performance in July 2007.  Murray

OPINION AND ORDER – PAGE 5

rated Arigbon as needing improvement in three categories but scored her as proficient in the

remaining six categories.  (Oldham Decl. Ex. 16.)  Murray testified that Arigbon needed

improvement because she was still learning the job.  (Oldham Decl. Ex. 23 at 9-10.)  In addition,

the comments section stated that the job typically required twelve to eighteen months to learn

and that Arigbon was "at or above what would be expected in just 3 months."  (Oldham Decl. Ex.

16.)  Overall, Murray was satisfied with Arigbon's performance at the three-month mark.

(Murray Decl. at 9.)

Murray and Arigbon discussed the review at a meeting.  Arigbon indicated that she

needed more training.  (Oldham Decl. Ex. 1 at 4.)[2]  Murray told Arigbon not to worry because

the average case manager takes at least a year to become proficient in determining client

eligibility.  *Id.* at 30.

## II.  Arigbon's Employment Conditions After She Announced Her Pregnancy

### A.  Arigbon's Complaints of Pregnancy-Related Health Issues

In September 2007, Arigbon told Murray that she was pregnant and later reported that she

was experiencing related health issues.  (Oldham Decl. Ex. 1 at 22, 26; Carter Decl. Ex. 143.)

She took sick leave for appointments and for pregnancy-related illness.  (Oldham Decl. Ex. 14,

Ex. 28; Carter Decl. Ex. 188.)  In addition, Arigbon told Murray that pregnancy left her tired and

weak in the mornings and asked to adjust her work schedule to come in later.  (Oldham Decl. Ex.

27.)  Murray told Arigbon that she could adjust her hours and that she did not need to report

tardiness if she made up the time the same day that she came in late.  (Oldham Decl. Ex. 26.)

---

2  The County moved to strike this evidence, which comes from Arigbon's deposition testimony.
   I address the motion below.

**B.    Murray's Treatment of Arigbon**

In October and November 2007, Murray twice told Arigbon that her need to use the bathroom during staff meetings was a distraction, as was the fact that she appeared tired and unaware of her surroundings.  (Oldham Decl. Ex. 1 at 18.)  She spoke to Arigbon about her lack of participation in meetings and told her that it was not appropriate to respond "I'm just here," when co-workers asked her how she was feeling.  *Id.* at 19.  Arigbon informed Murray that those criticisms were partially related to pregnancy, which caused Arigbon to use the bathroom more often, left her fatigued and caused her to be less proficient.  *Id.* at 18-19, 35.  Arigbon also explained that she said "I'm just here" because she did want not go into detail about her personal affairs.  *Id.* at 20.  Arigbon testified that other employees also took breaks from meetings.  *Id.* at 19.

Arigbon testified that, after she became pregnant, she experienced problems with maintaining accuracy and attention to detail and by October was concerned about her ability to do her work.  (Carter Decl. Ex. 192 at 5, 7-11.)  In October and November 2007, Arigbon twice approached Murray and again informed her that she needed more training, that she was carrying a heavy caseload, and that she was concerned about getting behind in her work.  (Oldham Decl. Ex. 1 at 3-4, 5, 23, 35.)[3]  Murray responded that she would look into it.  *Id.* at 5.

Murray completed Foreman's evaluation on November 19, 2007, approximately one month after it was due.  (Carter Decl. Ex. 149.)  Foreman was behind in a portion of her caseload, and Murray marked Foreman as needing improvement in two areas: core job functions and quality, which refers to the employee's ability to timely and accurately perform job duties.

---

3  The County moved to strike this evidence, which comes from Arigbon's deposition testimony.  I address the motion below.

OPINION AND ORDER – PAGE 7

(Oldham Decl. Ex. 43 at 6; Carter Decl. Ex. 149.)  Murray indicated that Foreman needed improvement "because she is still on a learning curve."  *Id.*  Foreman scored as "excels" or "proficient" in communication, cultural competency, customer focus, dependability, ethics, personal responsibility and teamwork.  *Id.*  Murray noted that Foreman had volunteered for a homeless event, to do community training and to attend a diversity conference.  *Id.*

Murray also started her review of Arigbon's performance in November.  On November 18, Murray sent an email to her supervisor indicating that she had conducted a review of Arigbon's work and uncovered several errors.  (Carter Decl. Ex. 180.)  The next day, Murray asked the County's human resources department how Arigbon's expected pregnancy leave would impact her probationary period.  (Oldham Decl. Ex. 29.)  Specifically, Murray wanted to know whether Arigbon qualified for leave time under the Oregon Family Leave Act and if she needed to make a decision about whether Arigbon passed probation before Arigbon's anticipated leave.  *Id.*  Human resources told Murray that Arigbon would likely not qualify for an extension of the probationary period and that Murray needed to assess Arigbon's performance and discuss it with her.  *Id.*

Although Murray commenced a review of Arigbon's performance in November, Murray did not promptly conduct a formal evaluation of Arigbon until later.  (Oldham Decl. Ex. 43 at 6; Carter Decl. Ex. 180.)  In early December, Arigbon told Murray that her pregnancy-related medical problems could cause her to request leave.  (Oldham Decl. Ex. 1 at 24, 25, 27.)  Murray conducted Arigbon's second evaluation on December 12, 2007.  (Oldham Decl. Ex. 16 at 1.)  Before the second evaluation, Murray never communicated to Arigbon that she was not meeting the County's expectations as an employee.  (Oldham Decl. Ex. 1 at 33.)

OPINION AND ORDER – PAGE 8

### C.   Arigbon's Second Employment Evaluation

Murray's second evaluation of Arigbon was unfavorable.  Murray marked Arigbon as needing improvement in three areas and as unacceptable in four other areas, including core functions and quality.  (Oldham Decl. Ex. 16 at 1.)  Cultural competency was the only area where Murray rated Arigbon as proficient.  *Id.*

Murray provided a written explanation for her evaluation of Arigbon's performance.  *Id.* at 2-5.  She selected four of Arigbon's cases for review and described several errors she uncovered.  *Id.* at 3-5.  She further wrote that Arigbon had a 75 percent food stamp accuracy rate based on six errors in a state audit of twenty-four of her cases since May 2007.[4]  *Id.* at 3.  She recognized that the food stamp auditors had reversed two of the six errors but noted that the cases nonetheless contained mistakes.  *Id.*  Murray also wrote that Arigbon needed to improve her participation in meetings because she appeared to be sleeping during several meetings and often left the room.  Murray further wrote that Arigbon was expected to work her scheduled hours and call in when she was going to be late.  *Id.*

Two aspects of Murray's evaluation were inaccurate.  Although Murray recognized that state auditors reversed two of Arigbon's six food stamp errors, she included those errors when she came up with the 75 percent accuracy rate.  (Oldham Decl. Ex. 23 at 11.)  In addition, Arigbon was not in fact tardy but had received permission from Murray to alter her work schedule to come in a half hour later.  (Oldham Decl. Ex. 27.)

Murray met with Arigbon to discuss the evaluation.  At the meeting, Arigbon reminded Murray that she had requested permission to start later and therefore was not tardy to work.

---

4  The State of Oregon does a monthly review of randomly selected food stamp cases handled by the County.  (Carter Decl. Ex. 197 at 2.)

(Oldham Decl. Ex. 16 at 6.)  Murray acknowledged that she gave Arigbon permission to come in

thirty minutes later, apologized, and informed human resources of the error, but did not change

Arigbon's dependability score on the evaluation.  (Oldham Decl. Ex. 5 at 3, Ex. 32, Carter Decl.

Ex. 176, Ex. 177, Ex. 193 at 3.)  Murray informed human resources of the outcome of the

meeting.  (Oldham Decl. Ex. 32.)

 Arigbon provided a rebuttal to aspects of Murray's second evaluation.  (Oldham Decl. Ex.

16 at 6-7.)  She admitted that her work was sometimes late or insufficient, but attributed the

problems to a heavy caseload and pregnancy-related illness and that she lacked experience in

several County programs.  (Oldham Decl. Ex. 16 at 6.)  Arigbon also admitted that she did not

say much at meetings, and that she left meetings, but reminded Murray her pregnancy caused her

to leave.  *Id.*  She also indicated that she did not understand her low rating for personal

responsibility because she listened to Murray's feedback and had addressed areas for

improvement.  *Id* at 7.  Finally, Arigbon objected to Murray's criticism that Arigbon was not like

her co-workers in terms of opening up to Murray.  *Id.*  Arigbon wrote, "I feel like that is the

advantage of working in a diverse atmosphere because I can be who I am and my co-workers can

be who they are."  *Id.*  Murray did not follow up with Arigbon concerning her response to the

evaluation, nor did anyone from human resources speak to Arigbon about it.  (Oldham Decl. Ex.

1 at 34; Ex. 5 at 2, Ex. 23 at 13-14, 18.)

 Before the December 2007 evaluation, Arigbon was unaware of the County's

expectations in several areas.  Although Arigbon knew that the State of Oregon had goals for

food stamp accuracy rates and conducted reviews of food stamp cases, Arigbon was unaware that

the County expected her work to meet a specific food stamp accuracy percentage.  (Oldham

Decl. Ex. 1 at 30; Carter Decl. Ex. 110, 181-185, Ex. 192 at 2-4, 6, 42-43.)  In addition, Murray

OPINION AND ORDER – PAGE 10

did not tell Arigbon that she would be evaluated based on her participation during meetings. (Oldham Decl. Ex. 23 at 12, 15.)

### D.    Arigbon's Request for Medical Leave

In early January, Arigbon informed Murray about two pregnancy-related absences and about her intention to request medical leave.  (Oldham Decl. Ex. 1 at 27, Ex. 30; Carter Decl. Ex. 65.)  Arigbon applied for family medical leave on January 9, 2008, and received provisional approval the same day.  (Oldham Decl. Ex. 25.)  Her request stated that her pregnancy-related medical conditions made her unable to perform to the best of her abilities.  *Id.*  The request sought leave from February 2, 2008 until June 30, 2008.  *Id.*

Murray took two actions on the same day that Arigbon requested leave.  First, Murray contacted human resources regarding whether the County could rehire Arigbon if they terminated her during her probation, because "it would be nice to see if she could actually do the work when she is not having medical issues."  (Oldham Decl. Ex. 44 at 6.) Human resources approached labor relations to discuss how Arigbon's medical leave would affect her probationary period. (Oldham Decl. Ex. 38. at 5.)  Labor relations indicated that the under the terms of the labor agreement, the probationary period could not be extended unless the employee was out for more than six months of the period, but later stated that it would approach the union regarding an exception to the contract language.  *Id.* at 1-2.  Second, Murray told human resources that she would conduct a case review of Arigbon's files, focusing on cases before the holidays because many employees fell behind at that time due to time off.  (Oldham Decl. Ex. 23 at 18, Ex. 31 at 1, Ex. 37, Ex. 44 at 3.)

Murray testified that she decided to terminate Arigbon one day after Arigbon applied for leave or shortly thereafter.  (Oldham Decl. Ex. 23 at 18-19; Morf Decl. Ex. 201 at 2.)  Human

OPINION AND ORDER – PAGE 11

resources told the labor representative that the County was not interested in extending Arigbon's

probationary period.  (Oldham Decl. Ex. 42.)  She explained, "This is a very detailed position

and it would be very difficult to return to it after being off for five to six months . . . then factor

in we don't have satisfactory performance right now."  *Id.*[5]  She reached the five or six months

figure because that was how much leave Arigbon was eligible for under the Oregon Family

Medical Leave Act.  (Oldham Decl. Ex. 5 at 7.)

> **E.**     **Arigbon's Third Employment Evaluation and Termination**

On January 16, 2008, Murray provided Arigbon's third employment evaluation and

informed Arigbon that the County had decided to terminate her employment.  (Carter Decl. Ex.

104, Morf Decl. Ex. 204.)  The scores in the third evaluation mirrored those in the second

evaluation, with the exception that Murray ranked Arigbon as proficient in one area that she

previously marked as "needs improvement."  (Carter Decl. Ex. 104.)  In the narrative portion of

the evaluation, Murray explained that Arigbon continued to make computer entry errors.  (Carter

Decl. Ex. 104.).  Murray also noted that Arigbon had not timely completed tasks, such as

providing caseload statistics and completing a form for a client who needed it to keep his

housing.  *Id.*

Murray had conducted a review of Foreman's work on January 2, 2008 and marked her as

excels or proficient in all areas.  (Oldham Decl. Ex. 6 at 5.)  In a narrative attached to the

evaluation, she explained that Foreman had a 100 percent food stamp accuracy rate, based on a

review of 28 of her food stamp cases.  *Id.* at 7.  In addition, she noted that Foreman had

volunteered for committees and to take on other tasks.  *Id.*  A review of five of the food stamp

---

5  Arigbon's quotation of this statement in her brief excludes the portion referring to her
    performance.

OPINION AND ORDER – PAGE 12

cases Foreman handled in January, however, showed that she made two errors, for a 60 percent accuracy rate for that month.  (Oldham Decl. Ex. 35 at 2.)[6]

### III.    Arigbon's Actions After the County Terminated Her Employment

Arigbon took several actions following her termination.  She requested and received an exit interview with the County.  (Carter Decl. Ex. 199 at 3.)  She also completed an internal discrimination complaint.  (Carter Decl. Ex. 112.)  On March 18, 2008, she provided a tort claim notice to the County, which included, among other issues, that Arigbon believed that she was treated less favorably than Foreman in terms of training and her case load.  It also alleged that the County discriminated against her on the basis of pregnancy when it terminated her after giving her little time to improve following her second evaluation.  (Carter Decl. Ex. 200.) Arigbon also filed a complaint with the Bureau of Labor and Industries (BOLI) on March 26, 2008, in which she mentioned those same issues.  (Carter Decl. Ex. 189.)  Arigbon received a right to sue letter from BOLI and the EEOC and then filed suit in this court.   (Carter Decl. Ex. 190, Ex. 191.)

### LEGAL STANDARDS

### I.    Motion to Strike

Evidence submitted in a motion for summary judgment must satisfy the requirements of Federal Rule of Civil Procedure 56.  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). Rule 56(e) provides, in pertinent part, that "[a] supporting or opposing affidavit must . . . set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(e).  Under that standard, the court

---

6  Arigbon asserts that Foreman's positive review, despite her January food stamp accuracy rate, is evidence that Murray applied a different standard to Foreman.  (Pl. Mot. Summ. J., # 76, at 9.)  The January food stamp accuracy rate, however, was unavailable January 2, when Murray conducted Foreman's evaluation.

may consider evidence on summary judgment if the party offering it could present the evidence in an admissible form at trial. *Fraser*, 342 F.3d at 1037.

## II.    Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court cannot weigh the evidence or determine the truth and must construe the evidence in the light most favorable to the nonmoving party. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air. Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted). Moreover, courts require very little evidence from a plaintiff to survive summary judgment in an employment discrimination case because the ultimate question is one that is most appropriately conducted by the fact-finder, upon a full record. *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party. Fed. R. Civ. P. 56; *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment if it finds unresolved issues of material fact, even in situations where the cross motions allege that no disputed facts exist. *Id.*

OPINION AND ORDER – PAGE 14

## ANALYSIS

### I.      Motions to Strike

Although the parties have submitted several motions to strike evidence, most of the disputes relate to evidence that is either irrelevant to my analysis or duplicative of other evidence that neither party objects to.  I find, however, that Arigbon's testimony that she complained to Murray about her workload and lack of training is relevant to my analysis.  I therefore deny the motions to strike as moot, with the exception of the County's motion to strike Arigbon's testimony, which I address below.

The County seeks to strike Arigbon's statements that she complained to Murray about receiving less training and having a heavier caseload than Foreman.  The County argues that these statements were made out of court and therefore constitute inadmissible hearsay.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  A statement offered for a purpose other than to prove the truth of the matter asserted is not hearsay. *Orsini v. O/S Seabrooke*, 247 F.3d 953, 960 (9th Cir. 2001) (holding that statements of others that plaintiff repeated in his affidavit were not hearsay because they were relevant to prove the plaintiff's state of mind and the effect the statements had on him, not the truth of the matters asserted).

Here, Arigbon's out-of-court statements to Murray about her workload and training are relevant beyond the truth of her statements.  The statements are relevant to prove Murray 's knowledge of Arigbon's dissatisfaction.  As a result, I deny the County's motion with regard to Arigbon's statements that she complained to Murray.

OPINION AND ORDER – PAGE 15

II.    **Motions for Summary Judgment**

A.    **Pregnancy Discrimination – First and Sixth Claims for Relief**

Arigbon alleges claims against Multnomah County for pregnancy discrimination pursuant to Title VII and Oregon Revised Statute section 659A.030, under a disparate treatment theory. Courts apply the same prima facie standard to federal and state claims for disparate treatment. *See Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657, 719 P.2d 1322 (1986) (adopting U.S. Supreme Court's formulation of prima facie case); *Harris v. Sutton Motor Sales*, No. 08-6308, 2010 U.S. Dist. LEXIS 2111, at *5 n.2 (D. Or. Jan. 8, 2010). The plaintiff carries the initial burden to establish a prima facie case of discrimination. *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To meet that burden, the plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, "either through the framework set forth in *McDonnell Douglas* . . . or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (citation omitted). Under *McDonnell Douglas*, a court presumes unlawful discrimination if the plaintiff can show that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang*, 225 F.3d at 1123. If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *Id.* at 1123-1124.

Here, Arigbon pursues several theories to support her pregnancy discrimination claims. First, she contends that the County's probation policy is discriminatory on its face. Second, she argues that she has presented sufficient direct evidence of discrimination. Finally, she contends

OPINION AND ORDER – PAGE 16

that her claim survives summary judgment under the *McDonnell-Douglas* burden-shifting framework.

### 1.       Direct Evidence of Pregnancy Discrimination

Arigbon asserts two arguments that she has presented direct evidence of gender discrimination sufficient to establish a prima facie case.  First, she argues that the County's labor agreement constitutes per se pregnancy discrimination.  Second, she asserts that several of Murray's statements related to her pregnancy constitute direct evidence of discrimination.  The County argues that Arigbon has failed to exhaust her administrative remedies with regard to her claim that the labor agreement is facially discriminatory because she failed to allege it in her EEOC complaint.  The County further argues that both claims fail on the merits.

### a.       Exhaustion of Administrative Remedies

A person seeking relief under Title VII must first file a charge with the EEOC or  with the state or local administrative agency.  42 U.S.C. § 2000e-5(b).  "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002) (citation omitted).  Courts will not consider allegations of discrimination not included in the plaintiff's administrative charge "unless the new claims are like or reasonably related to the allegations contained in the EEOC charge." *Id.* at 1100 (citations omitted).  A plaintiff's civil claim is reasonably related to the allegations in the EEOC charge "to the extent that those claims are consistent with the plaintiff's original theory of the case." *Id.*  Thus, courts will not dismiss discrimination claims for failure to exhaust if the allegations "either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.*

OPINION AND ORDER – PAGE 17

(citation omitted).

Here, although Arigbon's BOLI complaint does not allege that the County's labor agreement was facially discriminatory, that claim is reasonably related to Arigbon's other allegations. Arigbon's BOLI complaint asserts that the County discriminated against her on the basis of her pregnancy and that it dismissed her during her probationary period before she had time to address Murray's negative evaluation of her performance. The EEOC investigation could reasonably encompass an inquiry into the County's policies covering probationary employees. I accordingly conclude that Arigbon has exhausted administrative remedies with regard to this claim.

### b.    Whether the Labor Agreement Is Facially Discriminatory

Under the Pregnancy Discrimination Act, (PDA), discrimination on the basis of "pregnancy, childbirth or related medical conditions" constitutes sex discrimination in violation of Title VII. 42 U.S.C. § 2000e(k). Employers must treat pregnant women "the same . . . as other persons not so affected but similar in their ability or inability to work." *Id.*; *see also* Or. Rev. Stat. § 659A.029 ("Women affected by pregnancy, . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.") Moreover, "written or unwritten employment policies and practices involving matters such as the commencement and duration of leave, [and] the availability of extensions . . . shall be applied to disability due to pregnancy . . . on the same terms and conditions as they are applied to other disabilities." 29 C.F.R. § 1604.10(b).

"[M]ost courts have held that the PDA does not impose an affirmative obligation on employers to grant preferential treatment to pregnant woman." *Urbano v Continental Airlines, Inc*, 138 F.3d 204, 206 (5th Cir. 1998) (citing cases); *see also Calif. Fed. Sav. & Loan Ass'n v.*

OPINION AND ORDER – PAGE 18

*Guerra*, 479 U.S. 272, 284-286 (1987) (holding that the PDA did not preempt state law granting preferential treatment to pregnant women because Congress merely intended not to require preferential treatment, not to prohibit it). Thus, "the analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armstrong v. Flowers Hosp.*, 33 F.3d 1308, 1313 (11th Cir. 1994).

An employment policy that classifies on the basis of pregnancy "must be regarded, for Title VII purposes, in the same light as explicit sex discrimination." *See Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991) (holding that a policy that excluded all women capable of bearing children from positions that involved lead exposure was facially discriminatory because it classified on the basis of gender and childbearing capacity, rather than fertility alone); *see also School Dist. v. Nilsen*, 271 Or. 461, 478 534 P.2d 113 (1975) (a plaintiff established unlawful discrimination under Oregon law where an employer required all pregnant probationary employees to resign). As a result, where a challenged policy is discriminatory on its face, the *McDonnell Douglas* burden shifting analysis does not apply. *United States EEOC v. Catholic Healthcare West*, 530 F. Supp. 2d 1096, 1101 (C.D. Cal. 2008) (employer's policy that prohibited pregnant employees from performing certain procedures was facially discriminatory).

A plaintiff, however, cannot prove facial pregnancy discrimination if the challenged policy does not single out pregnant women. *Armstrong*, 33 F.3d at 1313 (employer's policy requiring that all nurses treat the patients assigned to them did not constitute facial discrimination); *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 641 (6th Cir. 2006) (employer's policy of providing light duty work only to employees injured on the job is "pregnancy-blind" and therefore not facially discriminatory). In *Urbano*, for example, the Fifth Circuit held that an employer did not violate Title VII when it denied light duty assignments to pregnant employees

OPINION AND ORDER – PAGE 19

even though employees who were injured on the job were provided with that opportunity.  138 F.3d at 208.  The court reasoned that the policy was not facially discriminatory because it treated pregnant employees the same as other employees who suffered an injury off duty.  *Id.*; *see also Spivey v Beverly Enter., Inc.*, 196 F.3d 1309, 1314 (11th Cir. 1999) (same).

Here, the labor agreement is facially neutral.  It provides for an extension of the probationary period for workers who are absent for six months or more or who suffer an on-the-job injury.[7]  Thus, pregnant probationary employees are treated the same as every other probationary employee who suffers a non-occupational injury or who are not absent for more than six months.  The County's labor agreement is therefore not direct evidence of discrimination.

c.      **Whether Arigbon Has Presented Other Direct Evidence**

When a plaintiff offers direct evidence of discriminatory motive, she creates a triable issue as to the actual motivation of the employer.  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption."  *Vasquez*, 349 F.3d at 640 (citation omitted).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  *Dominguez-Curry*, 424 F.3d at 1038 (male supervisor's sexist comments that "women have no business in construction," that "women should only be in subservient positions," among others, were sufficient to raise a question of fact); *see e.g., EEOC v. Boeing Co.*, 577 F.3d 1044 (9th Cir. 2009) (supervisor's derogatory remarks about women,

---

7  The record is unclear on whether the labor agreement makes an exception for employees injured on the job because, as noted in the recitation of the facts, the labor agreement's section on workers' compensation appears to contain a typographical error.  I assume, however, that the agreement provides such an exception.

OPINION AND ORDER – PAGE 20

combined with his course of behavior, including his refusal of the plaintiff's request for transfer and decision to transfer a man instead, were sufficient to raise a question of fact regarding discriminatory animus).

Here, although Arigbon argues that she has presented sufficient direct evidence of pregnancy discrimination, she has not presented any evidence of discriminatory animus. Arigbon notes that Murray commented on her need to use the bathroom and spoke to her about tardiness despite giving her permission to change her work schedule. Those statements, however, are not directed at pregnancy but instead refer to Arigbon's performance. Moreover, although Arigbon points to the fact that Murray inquired into Arigbon's eligibility for medical leave, that inquiry is, at most, circumstantial evidence of pregnancy discrimination. Finally, although Arigbon tries to make much of the fact that a County human resources employee stated it would be difficult for Arigbon to return to work after five to six months, the statement also explained that Arigbon's current performance was unsatisfactory. Moreover, nothing indicates that the human resources employee played a part in any adverse employment action against Arigbon.

### 2.    Evidence of Pretext

"Once the defendant produces evidence of a legitimate non-discriminatory reason to counter the plaintiff's demonstration of a prima facie case, the *McDonnell Douglas* presumption of discrimination drops out of the picture." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004) (citation omitted). The plaintiff then bears the ultimate burden "to produce some evidence" suggesting that the defendant's adverse actions were "due in part or whole to discriminatory intent." *Id.* Courts in some cases have presumed, without deciding, that the plaintiff has established a prima facie case and proceed to this latter part of the analysis.

OPINION AND ORDER – PAGE 21

*Villiarimo,* 281 F.3d at 1062 n.8 (assuming without deciding that plaintiff made out a prima facie case of discrimination but affirming grant of summary judgment against plaintiff because she did not demonstrate that the employer's non-discriminatory explanations for her termination were pretextual).  I apply that approach here.

Arigbon alleges that the County discriminated against her on the basis of pregnancy in several respects.  She asserts the County: 1) unfairly evaluated her performance by assigning undeserved low scores, marking her down for issues that non-pregnant employees were not marked down for and failing to conduct her second evaluation on time; 2) failed to provide her with the same training or assistance as non-pregnant employees; 3) failed to accommodate her pregnancy-related disability; 4) terminated her instead of extending her probationary period and; 5) refused to reinstate her.[8]

Three of the alleged adverse actions are not relevant here.  Because the County's alleged failure to train or assist Arigbon began before she announced her pregnancy, I analyze that allegation as part of her racial discrimination claims.  Moreover, Arigbon's arguments regarding the County's "failure to accommodate" her pregnancy are misplaced because, as noted above, employers must merely treat pregnant employees in the same manner "as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k); *see also* Or. Rev. Stat. § 659A.029.  In addition, the late evaluation does not constitute an adverse employment action because the undisputed evidence shows that probationary employees could be terminated

---

8  Plaintiff provides a list of alleged adverse actions in her complaint that differs from the adverse actions she asserts in her motion for summary judgment.  The County objects to the additional allegations.  The complaint, however, gave fair notice of the additional claims.  It states that Murray disciplined Arigbon for deficiencies that other employees were not disciplined for, that Arigbon spoke to Murray about her heavier case load and that the County refused to extend Arigbon's probationary period. (Compl. at ¶ 13, 23, 29.)  I therefore have combined the allegations here.

at any time.  Finally, the County asserts, and Arigbon does not dispute, that Arigbon did not

request reinstatement following her termination.

The County asserts Arigbon's performance as the legitimate, non-discriminatory reason

for Arigbon's poor evaluation scores and subsequent termination.  Thus, Arigbon bears the

burden to establish discrimination.

A plaintiff may establish pretext "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."  *Chuang*, 225 F.3d at 1124.  In order

to survive summary judgment, the plaintiff must raise a genuine issue of fact such that "a

reasonable factfinder could conclude that the hiring decision was motivated at least in part" by

discrimination. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1041-1042 (9th Cir.

2005).

Arigbon has not offered evidence to show that the County's proffered explanation for her

performance evaluations and termination is unworthy of credence.  Arigbon's rebuttal to her

second performance evaluation and her deposition testimony both admit that her work suffered

after she became pregnant.  Moreover, although the evidence shows that other employees took

breaks from meeting and sometimes fell behind or made mistakes, she has offered no evidence to

show that the County tolerated mistakes as numerous as those indicated in her employment

evaluations.  In addition, Arigbon admitted that she did not participate in meetings.  Even if the

County did not discipline other employees for errors similar to Arigbon's, nothing indicates that

it tolerated employees who demonstrated both inaccuracy and non-participation.  *See Vasquez*,

349 F.3d at 641 ("[I]ndividuals are similarly situated when they have similar jobs and display

similar conduct.").

OPINION AND ORDER – PAGE 23

Arigbon has also failed to present evidence that the County fired her due to her pregnancy. The evidence shows that Murray spoke to Arigbon about her bathroom breaks and tardiness, both of which are related to her performance. Moreover, although Murray was mistaken about Arigbon's tardiness, Murray apologized and reported the error to human resources. The evidence also shows that Murray inquired into the County's probation policy after learning that Arigbon had pregnancy-related medical problems, and evaluated and fired Arigbon shortly after the second employment evaluation and almost immediately after Arigbon requested pregnancy leave. I find that this evidence does not suggest that Arigbon's pregnancy was a motivating factor for her termination under the unusual facts of this case. Even when I read the evidence in the light most favorable to Arigbon, her request for leave—not her pregnancy—affected the timing of her final review and termination. It was only after Arigbon's request for leave that Murray faced a choice to immediately terminate Arigbon for her poor performance, seek a special exception to the labor agreement's policy on extensions of the probationary period, or allow Arigbon to go out on leave and return as a permanent employee despite her performance issues. The fact that Murray chose the first option does not suggest that Murray fired Arigbon because she was pregnant, especially in light of the fact that there is no evidence that the County sought special extensions of the probationary period for non-pregnant probationary employees with performance issues.

In summary, I find that Arigbon has not presented direct evidence of pregnancy discrimination, nor has she presented evidence to demonstrate that the County's non-discriminatory reason for her termination was merely a pretext for pregnancy discrimination. I therefore grant the County's motion for summary judgment on Arigbon's pregnancy discrimination claims (the First and Sixth Claims for Relief) and deny Arigbon's cross motion for

OPINION AND ORDER – PAGE 24

summary judgment on those claims.

**B.    Racial Discrimination – Second and Fifth Claims for Relief**

Arigbon alleges claims against Multnomah County for race discrimination pursuant to Title VII and Oregon Revised Statute section 659A.030, under the theory of disparate treatment.

**1.    Whether the Racial Discrimination Claims Are Timely**

Both state and federal law required Arigbon to provide the County notice of her discrimination claims before she filed suit.  Under the Oregon Tort Claims Act, a plaintiff pursuing a claim against a public entity must provide a tort claim notice within 180 days of the alleged loss or injury.  Or. Rev. Stat. § 30.275(2)(b).  Similarly, a person seeking relief under Title VII must file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred" or, if the person initially instituted proceedings with the state or local administrative agency, within 300 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).

Here, the County contends that Arigbon's claim that the County assigned her a heavier workload is time-barred.  Arigbon filed her tort claim notice on March 18, 2008 and her BOLI complaint on March 26, 2008.  Thus, Arigbon cannot recover under her Oregon Revised Statute section 659A.030 claim for County conduct that occurred before September 20, 2007 and cannot recover under her Title VII disparate treatment claim for County conduct that occurred before May 31, 2007.  The County assigned a caseload to Arigbon when she commenced her employment in April 2007.  Thus Arigbon's workload claim is time-barred, unless some exception to the statute of limitations applies.

Arigbon argues that the continuing violation doctrine applies to her claim concerning her workload assignment.  The Supreme Court, however, has limited the reach of the continuing

OPINION AND ORDER – PAGE 25

violations doctrine, holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  A discrete act is an incident of discrimination, "such as termination, failure to promote, denial of transfer, or refusal to hire," that constitutes a separate, actionable "unlawful employment practice." *Id.* at 114.  In contrast, the continuing violation doctrine applies to hostile work environment claims, which by their nature consists of multiple related actions that by themselves may not constitute discrimination.  *Id.* at 122; *see also Lyons v. England*, 307 F.3d 1092, 1107 n.7 (9th Cir. 2002) ("If a plaintiff chooses to bring separate claims based on each discriminatory act, his assertion that this series of discrete acts flows from a company-wide, or systematic, discriminatory practice will not succeed in establishing the employer's liability for acts occurring outside the limitations period.")  Oregon courts draw a similar distinction between discrete acts of discrimination and a systematic pattern of conduct. *BoardMaster Corp. v. Jackson County*, 224 Or. App. 533, 551, 198 P.3d 454 (2008); *see also Davis v. Bostick*, 282 Or. 667, 674, 580 P.2d 544 (1978) (where evidence showed that plaintiff was harmed by each individual alleged wrongful act, she was not "entitled to ride out the storm and lump sum her grievances").

Here, Arigbon alleges that the County subjected her to a series of adverse employment actions, including its decision to assign her a heavier workload.  More importantly, the County's decision to give Arigbon a heavier workload was separately actionable to the extent that it affected the conditions of her employment.  *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 62 (2006) (Title VII's substantive provision prohibits discriminatory actions "that affect employment or alter the conditions of the workplace ").  I therefore find that Arigbon's racial discrimination claim is time-barred to the extent that it alleges the County assigned her a

OPINION AND ORDER – PAGE 26

heavier workload.

Arigbon's workload, however, remains relevant to her racial discrimination claim. An employee may use an employer's prior acts as background evidence in support of a timely claim. *Morgan*, 536 U.S. at 105, 113. Moreover, Arigbon also alleges that she raised concerns over her heavier workload in October and November 2007, within the statute of limitations period, and the County failed to take any action to address the situation.

## 2.    Prima Facie Case

As noted above, the same prima facie standard applies to federal and state claims for disparate treatment. *See Henderson*, 79 Or. App. at 657. Under the *McDonnell Douglas* framework, a court presumes unlawful discrimination if the plaintiff can show that: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang*, 225 F.3d at 1123. Here, the parties agree that Arigbon belongs to a protected class but dispute whether she can establish the remaining elements of her prima facie case.

### a.    Satisfactory Performance

To meet the second prong of the *McDonnell Douglas* prima facie test, a plaintiff need only establish that she was qualified for the job according to objectively measurable criteria, such as level of education or years of experience. *See Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981) ("In our view, objective job qualifications are best treated at step one and subjective criteria, along with any supporting evidence, are best treated at the later stages of the process.") Moreover, a plaintiff need only make a "minimal showing" at the prima facie stage. *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 660 (9th Cir. 2002) (plaintiff

OPINION AND ORDER – PAGE 27

established satisfactory performance with evidence that there were no formal write-ups for poor performance or disciplinary notices against him and that employer told him he could check back to see if he could be rehired).

Here, the evidence shows that Arigbon's job performance was satisfactory at least until she began to experience pregnancy-related health issues.  Murray 's first evaluation of Arigbon indicated that she was "at or above what would be expected in just 3 months."  In addition, Murray testified that she was satisfied with Arigbon's performance at the three-month mark.

### b.    Adverse Employment Action

Title VII's substantive anti-discrimination provision prohibits "discriminatory actions that affect the terms and conditions of employment."  *Burlington Northern & Santa Fe Ry.*, 548 U.S. at 64.  Thus, a plaintiff cannot establish prima facie discrimination if she "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit."  *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000).

Here, Arigbon alleges that the County: 1) failed to provide her with training or guidance to improve her performance, even after she requested assistance; 2) assigned her a more difficult caseload; 3) failed to conduct her second and third evaluations in a timely manner; 4)  unfairly evaluated her performance by assigning undeserved low scores, marking her down for issues that non-pregnant employees were not marked down for and failing to conduct her second evaluation on time; 5) refused to grant her an extension of the probationary period and terminated her; and 6) failed to reinstate her.[9]

---

9  Plaintiff provides a list of alleged adverse actions in her complaint that differs from the

OPINION AND ORDER – PAGE 28

Several of the alleged unlawful employment practices are not at issue. As noted above, Arigbon's claim that the County assigned her a heavier caseload is time-barred. Additionally, as explained above, the delayed evaluation was not an adverse employment action and Arigbon has not presented evidence that other employees escaped discipline or termination after exhibiting performance issues similar to hers. Finally, as noted above, the County asserts, and Arigbon does not dispute, that Arigbon did not request to be reinstated following her termination. My analysis therefore focuses on Arigbon's allegations that the County failed to provide her with training or to otherwise respond to her requests for help with her caseload.[10]

Denial of training may constitute an adverse employment action under certain circumstances. *Pullom v. United States Bakery*, 477 F. Supp. 2d 1093, 1103 (D. Or. 2007) (plaintiff established adverse employment action where evidence showed that her employer denied her training that she was entitled to under a labor agreement); *Wheeler v. Chertoff*, No. 08-1738, 2009 U.S. Dist. LEXIS 61799, at *15-16 (N.D. Cal. July 16, 2009) (holding that denial of training did not constitute an adverse employment action where plaintiff made no showing that the lack of training affected the terms and conditions of his employment); *Hess v. Multnomah County*, 216 F. Supp. 2d 1140, 1154 (D. Or. 2001) (denial of training did not constitute adverse employment action where plaintiff offered no evidence that the training

_____

adverse actions she asserts in her motion for summary judgment and I have combined them here.

10 The County argues that Arigbon did not exhaust her administrative remedies with regard to her claim that the County failed to provide her assistance with her caseload. As explained above, courts will not dismiss discrimination claims for failure to exhaust if the allegations "either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *B.K.B.*, 276 F.3d at 1100. Arigbon's tort claim notice and BOLI complaint both alleged that Arigbon believed that she was treated less favorably than Foreman in terms of training and her case load. I therefore conclude that she has exhausted her administrative remedies with regard to her claim that the County failed to provide her assistance.

OPINION AND ORDER – PAGE 29

would have resulted in a promotion or a salary increase or that her career was significantly impaired by not taking the training).

Here, the County's alleged failure to respond to Arigbon's requests for training or other assistance constitutes an adverse employment action in the circumstances of this case. The evidence shows that Murray knew that case managers required training to learn how to do the job properly. Moreover, Arigbon testified that training would have improved her performance. Thus, reading the evidence in the light most favorable to Arigbon, the County's alleged failure to provide training or assistance affected the conditions of her employment because it deprived her of the opportunity to improve her performance before the end of the probationary period.

### c.    Similarly Situated Individuals Treated More Favorably

Questions of fact remain regarding whether the County treated Foreman more favorably with regard to training. The evidence shows that the County helped Arigbon with some training matters and that Arigbon knew how to access the online training site. The evidence also shows that Arigbon asked Murray for training and did not receive assistance and that Murray told human resources that Arigbon had all the training she needed. Moreover, apart from the training issue, Arigbon has also presented evidence that she carried a heavier caseload and back-up duties than Foreman and that Murray knew that Arigbon had problems carrying the heavier caseload. The evidence is sufficient to meet the minimal burden required to establish a prima facie case. *See Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090, 1094 (9th Cir. 2005) ("[T]he requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.") (citation omitted).

OPINION AND ORDER – PAGE 30

### 3.    Legitimate Non-Discriminatory Reason

As noted above, "once the defendant produces evidence of a legitimate non-discriminatory reason to counter the plaintiff's demonstration of a prima facie case, the *McDonnell Douglas* presumption of discrimination drops out of the picture." *McGinest*, 360 F.3d at 1123.  Here, the County's does not articulate a reason for Murray's alleged failure to provide Arigbon with training or to respond to her requests for assistance.  As a result, the County has not met its burden and the presumption of discrimination remains.

The County argues that the same actor inference applies because Murray both hired and terminated Arigbon.  The same actor inference, however, relates to plaintiff's ultimate burden to prove that the defendant's legitimate non-discriminatory reason was merely pretext.  "[T]he point of the same-actor inference is that the evidence rarely is sufficient . . . to find that the employer's asserted justification is false' when the actor who allegedly discriminated against the plaintiff had previously shown a willingness to treat the plaintiff favorably." *Coghlan*, 413 F.3d at 1096 (citation omitted); *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 269 (9th Cir. 1996) (relying in part on the same-actor inference in granting summary judgment against plaintiff where she "did not produce any evidence showing [her employer's] proffered reasons were pretexts for an improper discriminatory motive); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1287 (9th Cir. 2000) (relying in part on the same-actor inference in granting summary judgment against plaintiff where she "ha[d] not cast doubt on the sincerity of [defendant's] explanation").  Nothing in the case law suggests the same actor inference relieves a defendant of the burden to articulate a legitimate, non-discriminatory reason for its actions.

In summary, I find that Arigbon has presented sufficient evidence to present her racial discrimination claims to the jury.  As noted, questions of fact remain regarding whether Foreman

OPINION AND ORDER – PAGE 31

was treated more favorably.  These questions of fact are material because the County has failed

to articulate a legitimate, non-discriminatory reason for its alleged preferential treatment of

Foreman.  Accordingly, I deny both parties' motion for summary judgment on Arigbon's racial

discrimination claims (the Second and Fifth Claims for Relief.)

C.    **State and Federal Claims of Retaliation for Opposition to Discrimination –
      Third and Seventh Claims for Relief**

Courts analyze state and federal retaliation claims under a similar framework.  *Harris v.*

*Pameco Corp.*, 170 Or. App. 164, 179, 12 P.3d 524 (2000) ("Title VII law is instructive in

interpreting ORS 659.030."); *see also Pool v. Vanrheen*, 297 F.3d 899, 910 (9th Cir. 2002) ("Or.

Rev. Stat. § 659A.030 was modeled after Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-

3(a), which prohibits similar conduct.").  Once a plaintiff establishes a prima facie case, the

burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.

*Manatt v. Bank of Am.*, 339 F.3d 792, 801 (9th Cir. 2003) (citation omitted).  If the defendant

meets that burden , the burden shifts back to the plaintiff to establish that the defendant's

explanation was merely a pretext for impermissible retaliation.  *Id.*

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that (1)

she engaged in a protected activity; (2) her employer subjected her to an adverse employment

action; and (3) a causal link exists between the protected activity and the adverse employment

action.  *Pool*, 297 F.3d at 910.  "The Oregon Court of Appeals has characterized the causal link

as a 'substantial factor' determination."  *Id.* (citing *Seitz v. State ex rel. Albina Human Res. Ctr.*,

100 Or. App. 665, 675, 788 P.2d 1004 (1990)).  Here, the County argues that Arigbon cannot

meet the first and second elements of her prima facie case.

An employee's statement does not constitute protected activity, "unless it refers to *some*

OPINION AND ORDER – PAGE 32

practice by the employer that is allegedly unlawful." *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) (holding plaintiffs engaged in protected activity when they sent a letter stating that their employer had engaged in a continuing series of unlawful discriminatory employment practices, and that there were persistent complaints about these practices); *see also Pool*, 297 F.3d at 911 (plaintiffs' letter did not constitute protected activity because it did not refer to an allegedly unlawful practice when it mentioned to efforts to re-establish "good old boy network" but also stated that the employer had made strides to create a diverse workforce).

"It is not necessary, however, that the practice be demonstrably unlawful; opposition clause protection will be accorded whenever the opposition is based on a 'reasonable belief' that the employer has engaged in an unlawful employment practice." *Crown Zellerbach Corp.*, 720 F.2d at 1013 (citation omitted).  Moreover, a complaint need not be formal in order to constitute protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000).

Here, the record is devoid of any evidence that  Arigbon complained of discrimination. Arigbon contends that she engaged in protected activity when she opposed Murray's comments about her pregnancy-related performance issues, brought up her caseload in comparison to Foreman's, and when she challenged her second employment evaluation.[11]  At most, Arigbon's

---

11 In addition to her written rebuttal to the second employment evaluation, Arigbon relies on the following excerpt of her testimony:

> "I expressed to Martha . . . why I was  experiencing what I was experiencing, at the point when I felt that she was harassing me or confronting me from different conditions that I was experiencing through my pregnancy, I then explained to Martha the reason why I was feeling tired or the reason why I was appearing to be fatigued or not being proficient as usual is because of my pregnancy."

(Oldham Decl. Ex. 1 at 35.)

In addition, Arigbon cites to the record where she replied "yes" that she spoke to Murray about the difference in treatment between her and Foreman.  Arigbon, however, does

OPINION AND ORDER – PAGE 33

statements convey that she felt Murray had treated her unfairly.  I therefore conclude that Arigbon has failed to present sufficient evidence to establish a prima facie case.  Accordingly, I grant the County's motion for summary judgment on Arigbon's retaliation claims (the Third and Seventh Claims for Relief) and deny Arigbon's cross motion for summary judgment on those claims.

### D.    Oregon Family Leave Act - Fourth Claim for Relief

Under the Oregon Family Leave Act (OFLA) provides, "an eligible female employee may take a total of 12 weeks of leave within any one-year period for an illness, injury or condition related to pregnancy or childbirth that disables the eligible employee from performing any available job duties offered by the employer."  Or. Rev. Stat. § 659A.162(2)(a).  Under the OFLA, employers may not deny family leave to an eligible employee and, under a 2007 amendment to the Act, may not "retaliate or in any way discriminate" against employees for invoking their rights under the act.  Or. Rev. Stat. § 659A.183.

Here, Arigbon argues that the County's labor agreement is facially discriminatory to pregnant employees who are unable to complete probation before they take OFLA leave.  The OFLA specifically provides that an employee who takes medical leave is not entitled to "[a]ny right, benefit or position of employment other than the rights, benefits and position that the employee would have been entitled to had the employee not taken the family leave."  Or. Rev. Stat. § 659A.171(3)(b).  As discussed more fully in the section on pregnancy discrimination

---

not cite to her testimony immediately following that response, which describes her complaint in the following manner:  "When we had a meeting about Jennifer complaining or indicating her caseload was overwhelming, I expressed my concerns to Martha then as well because mine—you know, mine was overwhelming as well . . .and then we went over facts that I related to her many times previously before."  *Id.*  Arigbon cites to no evidence that she complained Foreman received better treatment on account of her race.

above, the County's labor agreement policy is facially neutral because it treats pregnant employees who request leave during the probationary period the same as other employees who suffer injuries while off duty. Accordingly, I find that the County's labor agreement policy on extensions of the probationary period does not violate the OFLA.

Arigbon, however, also alleges that the County violated the Oregon Family Medical Leave Act by failing to extend her probationary period and by negatively evaluating her performance and terminating her after she requested leave.[12] Arigbon asserts the same facts as the basis for an "interference" and a "retaliation" claim under the OFLA. The County argues that the OFLA does not recognize a cause of action for interference and that plaintiff cannot establish prima facie case or pretext to support an OFLA retaliation claim.

### 1.    Whether OFLA Includes a Cause of Action for Interference

Under the FMLA, a claim alleging that an employer visited negative consequences on an employee for attempting to use protected leave is covered under a provision governing "interference," 29 U.S.C. § 2615(a)(1). *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). Under § 2615(a)(1), it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). In contrast, when an employee alleges that the employer punished him or her for opposing the employer's unlawful practices, the issue then becomes one of

---

12 The County argues that Arigbon has not exhausted administrative remedies with regard to her claim that the County violated OFLA by failing to extend her probationary period. Arigbon's tort claim notice and BOLI complaint both asserted that the County terminated her after giving her little time to improve following her second evaluation but did not specifically mention an extension of the probationary period. I find, however, the County's decision to terminate Arigbon is bound up with its decision not to extend her probationary period. When the County decided to terminate her, it also decided not to extend her probation. As a result, I find that her termination claim encompasses the probation claim.

discrimination and retaliation under 29 U.S.C. § 2615(a)(2).  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 (9th Cir. 2003).  The distinction is important because, in an interference claim, the *McDonnell Douglas* burden-shifting framework does not apply.  *Id.*  In those cases, "the issue is not that the employer treated one employee worse than another but that every employee has substantive rights under FMLA that the employer must respect."  *Id.* (citation omitted).

Here, as noted, the same facts form the basis for Arigbon's OFLA interference and retaliation claims.  She asserts that the County negatively evaluated her and terminated her because she attempted to exercise her right to OFLA leave.  Under the Ninth Circuit's analysis in *Bachelder*, her OFLA allegations are properly characterized as an interference claim.  259 F.3d at 1124.

Unlike the FMLA, the OFLA does not separately prohibit "interference."  Rather, after the 2007 amendment, the OFLA provides:

> It is an unlawful practice for a covered employer to: (1) Deny family leave to which an eligible employee is entitled . . .  or (2) Retaliate or in any way discriminate against an individual  . . . because the individual has inquired about the provisions of [the Act] submitted a request for family leave or invoked any provision of [the Act].

Or. Rev. Stat. § 659A.183.  The OFLA, however, "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Family and Medical Leave Act of 1993."  Or. Rev. Stat. § 659A.186(2).  Thus, since the 2007 amendment, courts in this district have not questioned whether the OFLA provides a cause of action for interference and have applied the law regarding FMLA interference claims to similar claims under OFLA.  *See Mink v. Marion County Juvenile Dep't*, No. 08-6298, 2009 U.S. Dist. LEXIS 118690, at *17-20 (D. Or. Dec. 17, 2009); *Lawson v. Walgreen Co.*, No. 07-1884, 2009 U.S. Dist. LEXIS 25441, at *17-29 (D. Or. Mar. 20, 2009); *Earnest v. Georgia-Pacific Corp.*, 2008 U.S. Dist. LEXIS 96620,

OPINION AND ORDER – PAGE 36

at *15-17 (D. Or. Nov. 25, 2008); *Lucke v. Multnomah County*, 06-1149, 2008 U.S. Dist. LEXIS 71861, at *116-120 (D. Or. Sept. 22, 2008).  I accordingly find that OFLA provides a cause of action for interference.[13]

### 2.    Merits of Arigbon's OFLA Interference Claim

To prevail on a claim for interference with a statutory right to medical leave, a plaintiff must prove by a preponderance of the evidence that her taking of protected leave "constituted a negative factor in the decision to terminate her."  *Bachelder*, 259 F.3d at 1125.  The plaintiff "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both."  *Id.*; *see also Boynton-Burns v. Univ. of Or.*, 197 Or. App. 373, 380, 105 P.3d 893 (2005) ("Proof of a causal connection can be established [1] *indirectly*, by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or [2] *directly*, through evidence of retaliatory animus directed against a plaintiff.").  Here, the County argues that Arigbon is unable to establish that her request for leave caused the County to terminate her employment.

---

13 The label I attach to Arigbon's OFLA claim is only significant to the extent that it affects  her burden of proof.  As noted, in an interference claim, the *McDonnell Douglas* burden-shifting framework does not apply.  In contrast, although the Ninth Circuit and Oregon courts have apparently not addressed the issue, some courts in this district have required that a plaintiff seeking to establish a protected leave retaliation claim must establish pretext if the employer offers a legitimate, non-discriminatory reason for its actions.  *See Price v. Multnomah County*, 132 F. Supp. 2d 1290, 1296 (D. Or. 2001) *but see Sanders v. City of Newport*, 2008 U.S. Dist. LEXIS 43197, at *23 n.7 (D. Or. May 30, 2008) (declining to apply the burden-shifting analysis of McDonnell Douglas to plaintiffs' FMLA retaliation claim).  Here, however, as explained below, I find that Arigbon has presented direct evidence that her request for leave played a part in her negative evaluation and termination.  The *McDonnell Douglas* framework is merely an alternative to direct evidence of discrimination.  *Vasquez,*, 349 F.3d at 640.  Thus, regardless of whether Arigbon's OFLA claims constitute interference or retaliation, questions of fact remain that defeat the parties' motions for summary judgment.

OPINION AND ORDER – PAGE 37

I find that questions of fact remain regarding whether Arigbon's request for leave played a significant factor in the County's decision to negatively evaluate her performance, deny an extension of the probationary period and ultimately terminate her.  Arigbon has presented direct evidence that her request for leave was a factor because Murray inquired into the County's probation policy after learning that Arigbon had pregnancy-related medical problems.  She has also presented circumstantial evidence because Murray evaluated and fired Arigbon shortly after Arigbon requested pregnancy leave.  Thus, reading the evidence in the light most favorable to Arigbon, her request for leave prompted her final review and termination.  Reading the evidence in the light most favorable to the County, however, Arigbon had performance issues that began before her request for leave and that did not improve following her second evaluation.  As a result of the questions of fact created by this evidence, I deny both parties' motions for summary judgment on Arigbon's OFLA interference claim (Fourth Claim for Relief).

## CONCLUSION

Arigbon's Motion to Strike Defendant's Exhibit 132 (#99), Arigbon's Motion to Strike Defendant's Exhibit 202 and 203 (#102) and Arigbon's alternative motion to strike contained in her Motion for Leave to File a Sur-Reply (#113) are denied as moot.  The County's Motion to Strike Hearsay (#89) is denied with regard to the statements made by Arigbon and the remainder of the motion is denied as moot.

Arigbon's Motion for Summary Judgment (#65) is denied.  The County's Motion for Summary Judgment (#69) is granted in part and denied in part.  The motion is granted with respect to Arigbon's pregnancy discrimination claims (the First and Sixth Claims for Relief) and retaliation claims (the Third and Seventh Claims for Relief).  The motion is denied with respect to Arigbon's racial discrimination claims (the Second and Fifth Claims for Relief) and OFLA

OPINION AND ORDER – PAGE 38

claim (Fourth Claim for Relief).  Finally, Arigbon has conceded her wrongful discharge claim (Eighth Claim for Relief) and that claim is dismissed with prejudice.

IT IS SO ORDERED

Dated this 20th day of May 2010.

 /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge

OPINION AND ORDER – PAGE 39